COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-364-CV
  
  
THE 
BURLINGTON NORTHERN AND                                        APPELLANT
SANTA 
FE RAILWAY COMPANY
   
V.
  
SOUTH 
PLAINS SWITCHING, LTD. CO.                                       APPELLEE
 
  
------------
 
FROM 
THE 348TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        This 
case arises from a dispute over the meaning of certain provisions in an Asset 
Sales Agreement (the Agreement) between Appellant Burlington Northern and Santa 
Fe Railway Company (BNSF) and Appellee South Plains Switching, Ltd. Co. (South 
Plains). After careful consideration of Appellant’s issues, we affirm in part 
and reverse and render in part.
Background and 
Procedural History
        BNSF 
and South Plains executed the Agreement in May 1999. Under this Agreement, BNSF 
conveyed to South Plains certain “rail line” properties (tracks) in Lubbock, 
Texas, and certain rail freight transportation business conducted on those 
tracks. The tracks conveyed were known as the “Lower Yard.” Under the 
Agreement, BNSF retained its “through route” business, conveying to South 
Plains only the “switching services” provided to BNSF’s “through 
route” customers.
        “Through 
route” business consists of shipments that originate with BNSF at one location 
and, although some of the shipping takes place on rail lines owned by other 
carriers, continue to be billed by BNSF for the entire trip. South Plains’ 
switching services for these shipments includes interchanging cars and moving 
them to and from the industry track destinations on the rail lines conveyed to 
South Plains by the Agreement. For these switching services, South Plains 
receives a “division of revenue.” South Plains began operations under the 
Agreement on July 5, 1999.
        During 
negotiations surrounding the creation of the Agreement, South Plains expressed 
an interest in acquiring additional properties known as the North Yard. No 
official arrangements were made with regard to the North Yard property before 
execution of the Agreement. From execution of the Agreement in 1999 through 
mid-2001 there were conversations between BNSF and South Plains regarding the 
sale of the North Yard.
        Sometime 
in June or July 2001, BNSF informed South Plains that the property and switching 
operations for the North Yard were not for sale, ending any negotiations 
regarding the conveyance of that property. On January 17, 2002 and February 4, 
2002 South Plains wrote letters to BNSF requesting BNSF’s consent to impose 
surcharges on all cars interchanged (or “switched”) by South Plains. South 
Plains explained the need for a surcharge by stating that it had underbid the 
“division of revenue” deal under the Agreement because it relied on oral 
promises that the North Yard would be conveyed, thereby providing South Plains 
with another source of revenue.
        On 
February 22, 2002, exercising its rights under the Agreement, BNSF denied 
consent to the surcharge request, stating its belief that the additional 
surcharge would adversely affect its volume of business because shippers might 
resort to using trucks instead of paying the extra rail line fee. BNSF initiated 
an action for declaratory judgment on the surcharge issue on April 16, 2002. 
South Plains asserted several counterclaims that were either disposed of through 
summary judgment or nonsuited prior to trial.
        The 
case proceeded on four declaratory judgment claims brought by BNSF. The jury 
answered adversely to BNSF on all four jury questions regarding the parties’ 
rights under the Agreement. The court denied BNSF’s motions for directed 
verdict, judgment notwithstanding the verdict, and a new trial. On August 23, 
2004, the trial court rendered judgment on the verdict. In three issues, BNSF 
appeals the trial court’s judgment.
Surcharge Issue
        In 
its first issue, BNSF contends that the jury’s finding that BNSF unreasonably 
withheld consent to South Plains’ surcharge request is not supported by the 
judgment for two reasons. First, the trial court erred by refusing to instruct 
the jury on the proper legal meaning of the term “unreasonably.” Second, the 
evidence is legally and factually insufficient to support the jury’s finding.
Was a 
definition required?
        The 
phrase in question used in the Agreement is as follows: “[South Plains] shall 
not impose a surcharge upon [rail] traffic without the prior written consent of 
[BNSF], which consent shall not be unreasonably withheld.”
        BNSF 
asserts that without an instruction from the trial court defining the term 
“unreasonable,” the jury incorrectly applied its own subjective definition 
of the term, rather than the proper legal meaning, which resulted in an improper 
verdict. In support of its contention, BNSF relies upon Mitchell’s Inc. v. 
Nelms, 454 S.W.2d 809, 813 (Tex. Civ. App.—Dallas 1970, writ ref’d n.r.e.).
        Texas 
courts have not settled on a legal definition of “unreasonable.” “What 
constitutes the elements of unreasonableness in the act of withholding consent 
presents a question not simple in resolution.” Id. In Mitchell’s, 
the court held that a landlord did not unreasonably withhold consent to a 
sublease as mandated by the terms of the lease. Id. at 814. In reaching 
this decision, the court examined the specific terms of the lease to determine 
the intention of the parties. Id. After considering the lessor’s reason 
for denying consent, the court examined the original intention of the parties as 
evidenced in the lease and decided that the lessor did not act unreasonably or 
arbitrarily. Id. at 815.
        In 
examining the elements of unreasonableness in the act of withholding consent, 
the Mitchell’s court noted that unreasonable conduct compares to 
arbitrary action. Id. at 813-14. The court also mentioned the definition 
of arbitrary—“without fair, solid and substantial cause or reason.” Id. 
However, the word “arbitrary” is only used as a “yardstick” in Mitchell’s 
to show that for something to be reasonable it must be something more than 
arbitrary. Id. The Mitchell’s court did not hold that overcoming 
arbitrariness equates to reasonableness. See id.
        Mitchell’s, 
in fact, proposes several meanings for the term “unreasonable,” including a 
definition of the word from Webster’s dictionary and definitions applied by 
other courts. Id. The Mitchell’s court did not rely on any 
particular definition of unreasonable but instead “made reference to various 
definitions of ‘reasonable’ and ‘unreasonable,’ including the definition 
supplied by Webster’s Dictionary, but did not approve any specific language 
that would necessarily be suitable for a jury instruction.” Terry I. Cross, The 
Ties That Bind: Preemptive Rights and Restraints On Alienation That Commonly 
Burden Oil and Gas Properties, 5 Tex. 
Wesleyan L. Rev. 193, 224 n.182 (1999).
        Furthermore, 
“[a]lthough the court in Mitchell’s discussed various definitions of 
unreasonableness in the abstract, 
it relied on the specific terms of the contract to hold that the landlord had 
acted reasonably in withholding his consent.” B.M.B. Corp. v. McMahan’s 
Valley Stores, 869 F.2d 865, 868 (5th Cir. 1989) (emphasis added). Further 
interpreting Mitchell’s, the B.M.B. court opined, “[i]t thus 
appears that under Texas law, the reasonableness of a refusal to consent . . . 
is determined by reference to the terms and conditions of the original . . . 
[agreement].” Id. at 869.
        The 
conclusion reached in B.M.B. is consistent with another case decided by 
the Fifth Circuit in which the jury instruction stated: “The term 
‘unreasonable withholding of consent’ means that a decision to withhold 
consent is made without any reasonable basis. . . . [T]he question is whether 
there was any reasonable basis under the 
circumstances for the decision[] . . . to withhold its consent.” Perez 
v. Jefferson Standard Life Ins. Co., 781 F.2d 475, 479 (5th Cir. 1986) 
(emphasis added). The court, rather than supplying a legal definition of the 
word “unreasonable,” allowed the jury to apply a meaning to the word based 
on the circumstances or evidence presented. Id.
        According 
to another court, the standard is generally anything that falls below what a 
reasonable person in like circumstances would do. Haack v. Great Atl. & 
Pac. Tea Co., 603 S.W.2d 645, 650 (Mo. Ct. App. 1980). What equates to 
reasonable or unreasonable cannot be readily defined. See id. 
Unreasonableness is relative, and “[e]very case must be judged on its own 
particular facts.” Id.
        However, 
an interpretation of Mitchell’s in a reporter’s note to the 
Restatement Second of Property claims that “a general statement of what 
constitutes unreasonableness in this area [landlord granting sublease to tenant] 
was given in Mitchell’s . . . that being: without fair, solid and 
substantial cause or reason.” Restatement 
(Second) of Property § 15.2 note (1977). The proper standard applicable 
to the reasonableness of a landlord’s refusal to consent to an assignment or 
sublease is that of a reasonable person in the landlord’s position. Funk v. 
Funk, 633 P.2d 586, 589-90 (Idaho 1981).
        Moreover, 
in determining whether a lessor is acting unreasonably in denying a sublease or 
assignment, courts have examined various factors, including the intended use of 
the property, the financial status of the proposed tenant, and the evidence 
supporting the commercial reasonableness of the denial. See Pletz v. Standard 
Homes Co., 342 S.W.2d 621, 621 (Tex. Civ. App.—San Antonio 1961, no writ) 
(holding that landlord’s desire to prevent business competition between 
tenants justified his refusal to consent to sublease without first obtaining 
knowledge of intended use of property); Johnson v. Jaquith, 189 So.2d 
827, 829-30 (Fla. Dist. Ct. App. 1966) (holding landlord’s refusal to consent 
to assignment is not unreasonable without proof of prospective assignee’s 
financial status); Bismarck Hotel Co. v. Sutherland, 529 N.E.2d 1091, 
1097 (Ill. App. Ct. 1988) (stating that a suitable sublessee is “one who is 
ready, willing and able to sublease the premises and who, at least, meets 
reasonable commercial standards”), appeal denied, 535 N.E.2d 912 (Ill. 
1989).
        Here, 
BNSF asserts that the trial court erred by not instructing the jury to apply a 
strict definition of the term “unreasonable” as used in the phrase 
“unreasonably withhold consent” in the Agreement between BNSF and South 
Plains. BNSF contends that because the trial court refused to instruct the jury 
as to the definition of “unreasonable,” it was unfairly held to a higher 
standard of care. South Plains argues that the legal definition of 
“unreasonable” was not adopted by the Mitchell’s court or by any 
other court in Texas. We agree. Because no legal definition of 
“unreasonable” has been adopted or approved by Texas courts, the trial court 
did not err by refusing to submit a definition of the word “unreasonable” to 
the jury. We hold that the jury was free to consider the ordinary meaning of the 
phrase in light of the evidence presented.
Legal and 
Factual Sufficiency
        BNSF 
contends that the evidence is legally and factually insufficient to support the 
jury’s finding that BNSF unreasonably withheld its consent to South Plains’ 
surcharge request. BNSF argues that the evidence conclusively established that 
its refusal to consent was reasonable because the surcharge 1) was nothing more 
than a negotiating tactic, 2) was arbitrary, having no economic or analytical 
basis, 3) would have adversely affected the volume of rail traffic, and 4) was 
itself patently unreasonable.
        A 
legal sufficiency challenge may only be sustained when: (1) the record discloses 
a complete absence of evidence of a vital fact; (2) the court is barred by rules 
of law or of evidence from giving weight to the only evidence offered to prove a 
vital fact; (3) the evidence offered to prove a vital fact is no more than a 
mere scintilla; or (4) the evidence establishes conclusively the opposite of a 
vital fact. Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No 
Evidence" and "Insufficient Evidence" Points of Error, 
38 TEX. L. REV. 
361, 362-63 (1960). In determining whether there is legally sufficient evidence 
to support the finding under review, we must consider evidence favorable to the 
finding if reasonable jurors could, and disregard evidence contrary to the 
finding unless reasonable jurors could not. City of Keller v. Wilson, 48 
Tex. Sup. Ct. J. 848, 863, 2005 WL 1366509, at *14 (Tex. June 10, 2005).
        An 
assertion that the evidence is factually insufficient to support a fact finding 
means that the evidence supporting the finding is so weak or the evidence to the 
contrary is so overwhelming that the answer should be set aside and a new trial 
ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). We are 
required to consider all of the evidence in the case in making this 
determination. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 
(Tex.), cert. denied, 525 U.S. 1017 (1998).
        Here, 
the jury heard testimony regarding the circumstances and background of BNSF’s 
backing out of the North Yard sale, as well as its denial of the surcharge based 
on economic reasons. Larry Wisener manager/president for South Plains Switching, [1] 
testified that he was informed by BNSF personnel that if South Plains performed 
well, the North Yard would be conveyed to South Plains. Larry Cronin, a former 
employee of BNSF, testified that Jerry Johnson, also an employee of BNSF, told 
him that if South Plains did a good job, BNSF would convey the North Yard to 
South Plains. There was also testimony that Johnson announced at a luncheon that 
BNSF’s intent was to convey the North Yard to South Plains. There was 
testimony that South Plains initially accepted a lower division of revenue 
because it was under the impression that it would eventually receive the North 
Yard tracks and the imposition of the surcharge would not have been necessary if 
the North Yard had been conveyed to South Plains, as promised by BNSF.
        Wisener 
testified that in considering whether to request a surcharge, he calculated 
revenues lost from not acquiring the North Yard as promised by BNSF and what it 
would take to cover current expenses of operation. He testified that requesting 
the surcharge was not used as any type of tactic. The jury heard testimony from 
Johnson that before making his decision to deny South Plains’ request for the 
surcharge, he did not obtain or request the records of South Plains, he did not 
look at the cost and expenses of South Plains, and he did not meet with anyone 
from South Plains to talk about the surcharge request.
        The 
jury could have determined that BNSF’s denial of South Plains’ request for a 
surcharge was unreasonable. Accordingly, we hold that the evidence in this case 
was legally and factually sufficient to support the jury’s finding. We 
overrule BNSF’s first issue.
Access to Track 
9200
        The 
Agreement between BNSF and South Plains contains a “Description of Business 
Sold” section conveying the property 
interests in certain rail line segments, including track 9200, from 
BNSF to South Plains. The Agreement states that this grant is subject to 
BNSF’s retained interests including “continued access by rail” to track 
9200. Immediately following this provision is a subsection granting South Plains 
the rail freight transportation business 
conducted by BNSF on the rail line segments conveyed but, subject to the 
aforementioned retained interests.
        Prior 
to execution of the Agreement, BNSF conducted freight transportation business 
with Vulcan Construction Materials, L.P. (Vulcan) on track 9200. For nearly four 
years after the execution of the Agreement in May of 1999, BNSF continued to 
conduct its business with Vulcan on track 9200. In 2003, South Plains denied 
BNSF access to track 9200 to service Vulcan. Both BNSF and South Plains claim 
that the other party’s actions regarding track 9200 violate the terms of the 
Agreement. It is BNSF’s position that the retained interest of “continued 
access by rail” reserved for BNSF the right to continue conducting that 
portion of its freight transportation business with Vulcan on track 9200. BNSF 
claims that the ordinary meaning of the phrase “continued access” as used in 
the Agreement, unambiguously permits BNSF to use 
track 9200 to the extent that it had before the Agreement.
        South 
Plains argues that the language of the Agreement grants South Plains the freight 
transportation business conducted on track 9200, including all the business done 
with Vulcan, and that the “continued access” provision of the Agreement is 
for storage purposes only. South Plains maintains that the word “access” 
refers to the right to approach, 
not use the track.
        In 
its second issue, BNSF argues that the jury’s finding that the “continued 
access” provision of the Agreement does not permit BNSF to continue to service 
Vulcan on track 9200 fails to support the judgment because 1) the provision 
unambiguously permits BNSF unrestricted continued access to track 9200 and 
should have been enforced by the trial court as a matter of law, and 2) the 
trial court erred by admitting parol evidence regarding South Plains’ intended 
meaning for the unambiguous provision.
        An 
unambiguous contract must be construed by the court as a matter of law and not 
left open to the interpretation of its terms by a jury; however, it is proper to 
allow the trier of fact to interpret an ambiguous contract. Coker v. Coker, 
650 S.W.2d 391, 394 (Tex. 1983). The question of whether a contract is ambiguous 
is one of law for the court. Heritage Res., Inc. v. Nationsbank, 939 
S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is 
uncertain and doubtful or is reasonably susceptible to more than one 
interpretation. Id. A contract is not ambiguous if its words can be given 
a definite or certain meaning as a matter of law. Coker, 650 S.W.2d at 
393. Not every difference in the interpretation of a contract amounts to an 
ambiguity. Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex. 
1994). When a potential ambiguity arises, deciding whether the language is 
ambiguous is an issue of contract construction. Candlelight Hills Civic 
Ass’n, Inc. v. Goodwin, 763 S.W.2d 474, 477 (Tex. App.—Houston [14th 
Dist.] 1988, writ denied).
        Webster’s 
Dictionary defines “continued” as both “stretching out in time or space 
without interruption” and “resumed after interruption.” Webster’s Third New International Dictionary 
493 (2002). Applying these definitions, the use of the word “continued” 
within the Agreement can be interpreted to mean either continued from a point before 
the Agreement was executed or continued throughout the Agreement 
without interruption.
        “Access” 
is defined by the same dictionary as both the “ability to enter, approach, . . 
. or pass to and from” and the “ability to . . . make use of.” Id. 
at 11. Accordingly, access can mean either the right to make use of or the ability or right to approach. BNSF contends that the phrase 
“continued access” is not ambiguous when given its plain, ordinary, and 
generally accepted meaning.
        From 
the phrase alone, it cannot be ascertained which definition of “access” the 
parties intended, “use” or “approach.” However, individual words, 
phrases, or clauses should not be isolated and read out of context, but rather 
the document should be read as a whole to determine the intentions of the 
parties as expressed in the writing. State Farm Life Ins. Co. v. Beaston, 
907 S.W.2d 430, 433 (Tex. 1995). To achieve this the court will examine and 
consider the entire instrument so that none of the provisions will be rendered 
meaningless. R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 
S.W.2d 517, 519 (Tex. 1980). If the written instrument permits the court to 
ascertain a definite interpretation as to which one of two possible meanings is 
proper, the contract is not ambiguous. Id. It is presumed that the 
parties to a contract intend every clause to have some effect. Heritage Res., 
Inc., 939 S.W.2d at 121.
        Within 
the clause of the Agreement that reserves “continued access by rail to track 
9200,” there is an additional provision stating that BNSF will pay $1000 per 
year for such continued access beginning six years from the date of closing 
“and thereafter until such time as [BNSF] notifies [South Plains] in writing, 
that [BNSF] no longer desires to use said tracks.” South Plains’ contention 
that the “access” was limited to the right to “approach” the tracks but 
not to “use” them renders this portion of the Agreement meaningless. 
Therefore, by applying the applicable rules of construction and interpretation, 
which requires construing the contract as a whole, we conclude the “right to 
use” track 9200 is the only reasonable interpretation of the meaning of 
“access” from the face of the Agreement.
        When 
the Agreement is read as a whole, the term “continued access” is 
unambiguous. Therefore, the trial court erred by admitting parol evidence 
regarding the parties’ intended meaning for this unambiguous provision, and 
erred in submitting a jury question regarding interpretation of the term 
“continued access” in the Agreement. See Transcon. Gas Pipeline 
Corp. v. Texaco, Inc., 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.] 
2000, pet. denied) (stating that a trial court errs when it does not construe an 
unambiguous provision as a matter of law, and instead, submits the issue to a 
fact finder). We sustain BNSF’s second issue and render a declaratory judgment 
that the Agreement’s “continued access” provision permits BNSF to continue 
to use track 9200 with no restrictions, except payment after five years as 
provided by the terms of the Agreement.
The meaning of 
“Billed”
        Under 
the Agreement, when a freight shipment is interchanged between BNSF and South 
Plains, BNSF bills the freight customer for the whole shipping movement and then 
shares the revenue with South Plains according to the division of revenue 
provision. South Plains receives $40 for each carload of freight “billed in a 
block of 27 or more cars for an individual shipper or receiver,” and a higher 
rate of $125 for each carload of freight “billed” in a block of less than 27 
cars.
        A 
dispute arose between the parties over the meaning of the term “billed,” as 
used in the division of revenue provision. South Plains took the position that 
“billed” meant “waybilled”—i.e., that it should receive $125 for each 
car “waybilled” in less than a block of 27 cars. BNSF responded that 
“billed” meant “billed to the customer”—i.e., if BNSF billed a 
customer at lower unit train rates (because cars moved in a block of 27 cars or 
more) then South Plains was paid at the lower rate of $40.
        The 
jury was asked to determine whether the intent of the parties at the time they 
signed the Agreement was that the term “billed” in the division of revenue 
provision meant “billed to the customer” or “waybilled.” The jury 
answered that the term meant “waybilled.”
        In 
issue three, BNSF asserts that the term “billed” used in the Agreement 
unambiguously means “billed to the customer” rather than “waybilled.” 
Alternatively, BNSF argues that the evidence is legally and factually 
insufficient to support the jury’s finding.
        When 
a term in a written agreement is not specifically defined, it should be given 
its plain, ordinary, and generally accepted meaning. Heritage Res., Inc., 
939 S.W.2d at 121. If a written contract is worded so that it can be given a 
definite or certain legal meaning, then it is not ambiguous. Nat’l Union 
Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995); Coker, 
650 S.W.2d at 393. Parol evidence is not admissible for the purpose of creating 
an ambiguity. See Nat’l Union, 907 S.W.2d at 520. If, however, the 
language of a contract is subject to two or more reasonable interpretations, it 
is said to be ambiguous. Id. Only after a contract is found to be 
ambiguous may parol evidence be admitted for the purpose of ascertaining the 
true intentions of the parties expressed in the contract. Friendswood Dev. 
Co. v. McDade & Co., 926 S.W.2d 280, 283 (Tex. 1996). In particular, a 
specialized industry or trade term may require extrinsic evidence of the 
commonly understood meaning of the term within a particular industry. See 
Nat’l Union, 907 S.W.2d at 521 & n.6.
        Here, 
the term at issue in the Agreement is “billed.” The division of revenue 
provision of the Agreement does not contain the words “waybilled,” “billed 
to the customer,” or “freight bill.” BNSF’s contention that the term 
“billed” is unambiguous would require us to conclude that there is only one 
reasonable interpretation of the term “billed” as used in the Agreement 
between BNSF and South Plains.
        An 
ambiguity in a contract may be said to be “patent” or “latent.” Id. 
at 520. A patent ambiguity is evident on the face of the contract. Id. A 
latent ambiguity arises when a contract that is unambiguous on its face is 
applied to the subject matter with which it deals and an ambiguity appears by 
reason of some collateral matter. Id. If a latent ambiguity arises from 
this application, parol evidence is admissible for the purpose of ascertaining 
the true intention of the parties as expressed in the agreement. Id. When 
a latent ambiguity arises, the focus shifts to the facts and circumstances under 
which the agreement was made. GTE Mobilnet of S. Tex. Ltd. v. Telecell 
Cellular, Inc., 955 S.W.2d 286, 290 (Tex. App.—Houston [1st Dist.] 1997, 
writ denied) (op. on reh’g).
        Once 
a contract is found to be ambiguous, the interpretation of the contract becomes 
a fact issue. Coker, 650 S.W.2d at 394. Where application of the language 
used to the subject matter of the contract creates a genuine uncertainty as to 
which of two meanings is correct, the issue is properly resolved by a jury. Sec. 
Sav. Ass’n v. Clifton, 755 S.W.2d 925, 930 (Tex. App.—Dallas 1988, no 
writ).
        The 
trial court heard testimony regarding the facts and circumstances of the making 
of the Agreement. The testimony included the use of the terms “freight bill” 
and “billed to the customer,” which terms are used interchangeably in the 
railroad industry, while the term “waybilled” has a distinctively different 
meaning. We conclude that the trial court properly found that the Agreement is 
latently ambiguous because the Agreement uses the term “billed” but does not 
specify whether the referenced term means “waybilled” or “billed to the 
customer.” Therefore, because the Agreement was latently ambiguous, the trial 
court properly allowed extrinsic evidence to be considered by the jury in order 
to determine the intention of the parties. See Nat’l Union, Inc., 907 
S.W.2d at 520.
        The 
jury heard testimony from Dennis Olmstead, who acted as a consultant for South 
Plains, and who was involved in the drafting of the Agreement between BNSF and 
South Plains, regarding the term “billed.” He explained the difference 
between “waybilled” and “freight billed” and the impact of each. [2] 
Olmstead testified that in the original draft of the Agreement, the term 
“switched” was in the division of revenue paragraph, and that he wanted the 
term “switched” to be replaced with the term “billed.” Specifically, he 
stated that if the term “switched” was in the Agreement, BNSF could gather 
trains in its yard and make sure that each train contained more than 
twenty-seven cars before calling South Plains to come in and “switch” a 
train. In that event, South Plains would never be able to claim the higher 
division of revenue, even though more work was required on the part of South 
Plains. Olmstead testified that when he stated that the term “billed” should 
replace the term “switched,” he meant “waybilled” and not “freight 
billed.” Additionally, he testified that the “freight bill” goes to the 
customer and not to South Plains. Therefore, South Plains would not have any way 
to verify the accuracy of the payment. Considering all the testimony at trial, 
we hold that the evidence is legally and factually sufficient to support the 
jury’s finding that the ambiguous term “billed” meant “waybilled.” We 
overrule BNSF’s third issue.
Conclusion
        We 
reverse that portion of the trial court’s judgment that pertains to the 
“continued access” provision of the Agreement. We render a declaratory 
judgment that the Agreement’s “continued access” provision permits BNSF to 
continue to use track 9200 with no restrictions except payment after five years 
as provided by the terms of the Agreement. We affirm the remainder of the trial 
court’s judgment.
   
  
                                                                  DIXON 
W. HOLMAN
                                                                  JUSTICE
  
 
PANEL 
B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ
 
DELIVERED: 
August 26, 2005

 
NOTES
1. 
The record reveals that Larrry Wisener signed the Agreement as 
“manager/president” for South Plains Switching. Wisener testified that South 
Plains Switching was formed for the purpose of entering into the Asset Sale 
Agreement with BNSF. He also stated that South Plains Switching does not have 
any employees or equipment. In order to operate South Plains Switching, 
employees and equipment from South Plains Lamesa, another railroad owned by 
Wisener, are utilized.
2. 
A waybill is a document prepared by a transportation line at the point of a 
shipment showing the point of origin, route, description of shipment, and amount 
charged. A freight bill is a document issued by the carrier based on the waybill 
and other information. It is sent directly to the customer and is the document 
by which the customer compensates the companies for the rail service they 
provide.